IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 12-623 |
| | : | |
| ROBROY MACINNES, | : | |
| ROBERT KESZEY | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                        **May 30, 2014**

   In November 2013, following a jury trial, Defendants Robroy MacInnes and Robert Keszey were convicted of participating in a conspiracy to traffic in illegally obtained animals; MacInnes was also convicted of trafficking in illegally obtained animals in violation of the Lacey Act. Both Defendants have filed motions for a new trial under Federal Rule of Criminal Procedure 33, raising a variety of evidentiary and legal errors that allegedly deprived them of a fair trial.[1] For the reasons set forth below, the Court finds Defendants are not entitled to a new trial, and their motions will be denied.

## BACKGROUND

   On November 13, 2012, Defendants Glades Herp Farm, Inc. (Glades), MacInnes, and Keszey were charged in a two-count indictment. Count One of the indictment charged all three Defendants with conspiracy to traffic in illegal animals, including the Eastern Timber Rattlesnake (referred to herein as timber rattlesnakes or timbers).[2] Count Two charged

---

[1] Keszey and MacInnes each filed a separate motion for a new trial, but adopted and/or joined in all of the arguments set forth by the other. This Court will therefore refer to all grounds for relief and all arguments made in support as applicable to both Defendants unless otherwise specified.

[2] Without a permit, the taking, transportation, possession, and sale of the Eastern Timber

MacInnes and Glades with purchasing protected timber rattlesnakes, knowing those snakes were illegally collected from the wild in New York, in violation of the Lacey Act.  Glades, based in Bushnell, Florida, was MacInnes and Keszey's business, which bought and sold reptiles and other exotic animals.[3]

In July 2008, two individuals from New York, Darren Paolini and Justin Munsterman,[4] collected two adult timber rattlesnakes from the wild in New York without a permit.  The next month, each of those rattlesnakes gave birth to clutches of eleven or twelve babies.  Munsterman then sold two of the babies to an undercover agent from the New York Department of Environmental Conservation (NY DEC), Lieutenant Richard Thomas.  During this transaction, Munsterman told Thomas he intended to sell the additional timber rattlesnakes to Glades, which piqued Thomas's interest and prompted the authorities to monitor Glades's website.  Not long after Munsterman sold the snakes to Thomas, NY DEC investigators and Special Agent Randy Cottrell of the U.S. Fish and Wildlife Service observed that the inventory of timber rattlesnakes on Glades's website had increased.

Loren Zuck, the chief government witness in the case, began working as Glades's agent starting in the early 2000s, often manning a table sponsored by Glades at reptile shows held

---

Rattlesnake is unlawful in New York and Pennsylvania. The indictment also charged Defendants with conspiracy to traffic in Eastern Indigo Snakes, a species listed as threatened under federal law, and King Snakes, the possession of which is illegal in New Jersey without an appropriate permit.

[3] By Order of October 17, 2013, based in part on issues stemming from the company's failure to obtain legal representation, the Court severed Glades from the trial of Defendants MacInnes and Keszey.  Proof of the company's dissolution was filed on December 13, 2013, but the charges against it remain pending.  During oral argument on the motions for a new trial, the Government confirmed its intent to dismiss the case against the company at the Defendants' sentencing.

[4] Darren Paolini testified during trial, but Justin Munsterman did not.

multiple times per year in Hamburg, Pennsylvania.  During these shows, Zuck was in frequent contact with Defendants because he was not allowed to buy or trade animals without the permission of one of Glades's proprietors.  Munsterman and Paolini knew Zuck through the reptile shows and contacted him in August 2008 to determine whether Glades would be interested in purchasing the adult timber rattlesnakes or their offspring.  Zuck testified that after contacting Defendants regarding Munsterman and Paolini's proposed transaction, they authorized Zuck to purchase the timbers, with the understanding that he would then ship those snakes to Glades.  On September 21, 2008, Paolini and Munsterman met with Zuck in Easton, Pennsylvania, and gave him two adult timber rattlesnakes and the remaining babies in exchange for approximately $900 in Glades store credit.  Later that day, Zuck shipped all but two of the juvenile timber rattlesnakes from Philadelphia to Tampa, Florida, where MacInnes received and signed for the shipment.[5]  Approximately two weeks later, on October 8, 2008, Keszey shipped 20 timber rattlesnakes to an associate in Germany because, as Zuck testified, timber rattlesnakes are more valuable in Europe than in the United States.

During trial, the defense maintained that Zuck did not actually send the timber rattlesnakes he purchased from Paolini and Munsterman to Glades in Florida, and the September 21, 2008, shipment contained other reptiles.  According to the defense, facing criminal charges and under pressure from the Government, Zuck manufactured the story against Keszey and MacInnes.  Defendants also argued Glades had a number of other, legal sources for timber rattlesnakes and the snakes Glades sold in the fall of 2008 came from one of these alternative sources.

---

[5] With Defendants' agreement, Zuck kept two of the baby timber rattlesnakes he received from Munsterman and Paolini, and sent the remaining snakes to Glades in Florida.  Months later, having obtained additional timber rattlesnakes from another source, Zuck met Keszey at another

To counter Defendants' alternative-source theory, the Government called Kristen Wiley, who, along with her husband, James Harrison, is employed by the Kentucky Reptile Zoo. Wiley testified that in January 2008, she and Harrison shipped to Glades rock rattlesnakes and two clutches of juvenile timber rattlesnakes that had been born in the zoo. Wiley testified she and Harrison only engaged in that single transaction with Glades, and the snakes at issue in this case could not have been the same snakes from the January 2008 transaction given the age differences and different markings between the timbers sent by the Kentucky Reptile Zoo and the timbers offered for sale by Glades in the fall of 2008. On cross-examination, Defendants attempted to suggest Harrison could have surreptitiously included other adult timber rattlesnakes in the shipment, but Wiley stated this would not have occurred without her knowledge. During closing, Defendants argued that Harrison was Keszey's personal contact for timber rattlesnakes, but MacInnes may have had other contacts, including defense witness Eric Timaeus.

**DISCUSSION**

Under Federal Rule of Criminal Procedure 33, a district court "may vacate a judgment and order a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A court may grant a motion for new trial if it finds errors occurred during the trial and these errors "when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993). Harmless errors that do not deprive a defendant of a fair trial provide no basis for granting a defendant's Rule 33 motion. *Id.* The defendant bears the burden of proving a new trial should be granted, and must therefore show "(1) that error occurred at trial, and (2) that error had a substantial influence on the verdict." *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 720 (E.D. Pa. 2009),

---

reptile show in Virginia to return the two timbers he previously withheld from the shipment.

*aff'd*, 645 F.3d 564 (3d Cir. 2011).  Motions for a new trial are disfavored and "only granted with great caution and at the discretion of the trial court."  *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003).

Defendants raise many purported errors in an effort to gain a new trial.  Although asserted errors will be addressed individually below, the errors generally fall within the following categories: (1) improperly admitted evidence; (2) improper prohibitions on lines of questioning and improperly excluded evidence; and (3) jury instructions errors.  MacInnes also contends that during closing the Government improperly commented on his Fifth Amendment right to remain silent.

### A. Admitted Evidence

#### 1. Munsterman's Statement of Intent

First, Defendants maintain that the Court improperly admitted a statement made by Justin Munsterman under the hearsay exception found in Federal Rule of Evidence 803(3).  Prior to trial, the Government moved in limine for a ruling permitting it to introduce, through Lieutenant Thomas, a statement Munsterman made to Thomas while Thomas was acting undercover. Munsterman sold two timber rattlesnakes to Thomas and then told Thomas he was planning on selling the other snakes in his possession to Glades.  By Order of November 7, 2013, the Court ruled that Munsterman's statement to this effect was admissible under the state of mind exception found in Rule 803(3).  Defendants now contest the admission of the following testimony:

> Q. Did Mr. Munsterman say there were additional snakes?
> A. Yes, he did.
> Q. What did he say he was intending to do with those additional snakes?
> A. He said those additional snakes were going to [Loren Zuck] in Pennsylvania that ran the Glades Herp's booth and he and another individual were selling those snakes to that person.

Trial Tr. 14, Nov. 6, 2013.

Rule 803(3) provides for an exception to the rule against hearsay where a statement is of "the declarant's then-existing state of mind (such as motive, intent, or plan)."  Fed. R. Evid. 803(3).  The exception does not include a "statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will."  *Id.* Defendants argue the above-quoted testimony was inadmissible because the statement (1) is not only a statement of intent, but also a statement of Munsterman's belief that Zuck was going to send the snakes to Glades in Florida;[6] (2) was impermissibly used to establish the truth of what Munsterman believed, so as to bolster Zuck's credibility and corroborate his testimony that he did send the snakes to Glades in Florida; (3) is compound hearsay; and (4) lacks sufficient indicia of reliability because Munsterman's statements were not recorded by the wire Lieutenant Thomas wore during the undercover operation.[7]

In arguing Munsterman's statement to Thomas is a statement of Munsterman's belief that Zuck was going to send the snakes to Glades in Florida, Defendants mischaracterize the testimony.  The statement concerned Munsterman's intent or plan to sell the snakes to Glades by entering into a transaction with Zuck, Glades's representative in Pennsylvania.  Munsterman's

---

[6] Defendants concede that at least in part, this testimony referred to a statement of Munsterman's intent.  *See* Keszey's Supplemental Mem. in Supp. of His Mot. for a New Trial Pursuant to Fed. R. of Crim. P. 33 at 2 ("Munsterman's statements were of his intention (to sell the remainder of the snakes to Glades Herp agent, Loren Zuck), and belief (that Zuck would be sending the snakes to Glades in Florida).").

[7] Keszey also argues the statement was unfairly prejudicial to him because it related to the only unlawful transaction and overt act charged in the conspiracy.  This argument misreads the requirements of a conspiracy, as overt acts need not be unlawful, and the Government proved Defendants and their coconspirators took many other actions (both legal and illegal) that could properly be considered overt acts.  *See Braverman v. United States*, 317 U.S. 49, 53 (1942) (noting that an overt act need not be an unlawful act in and of itself).

statement does not include within it the assumption or belief that Zuck sent the snakes to Glades in Florida, and it is relevant without such an assumption.  That Munsterman sold the timbers to Glades's representative in Pennsylvania is independently relevant because it represents a link in the chain of events leading to Glades's receipt of the illegally obtained snakes.   Under the *Hillmon* doctrine, Munsterman's statement is admissible to show this exchange occurred because statements "admitted under Fed. R. Evid. 803(3) to show the declarant's intent or plan may be used to show that the declarant acted in accord with that plan."  *United States v. Donley*, 878 F.2d 735, 738 (3d Cir. 1989) (citing *Mut. Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285 (1892)).

As to Defendants' second argument, Munsterman's statement of intent was not used to establish the truth of Munsterman's belief, but rather to corroborate other evidence that his plan to sell the snakes to Glades came to fruition.  The admission of Munsterman's statement for this purpose still fits within the *Hillmon* rationale behind Rule 803(3), which is to corroborate other evidence that a planned action actually took place.   *See* Fed. R. Evid. 803(3) advisory committee's note 3 ("[A]llowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed."); *Hillmon*, 145 U.S. at 295 ("Evidence that just before March 5th [the declarant] had the intention of leaving Wichita with Hillmon would tend to corroborate the evidence already admitted, and to show that [the intended action was completed].");  *United States v. Sperling*, 726 F.2d 69, 74 (2d Cir. 1984) (holding "a declarant's *Hillmon* declarations regarding his own state of mind are admissible against a nondeclarant when they are linked with independent evidence that corroborates the declarations"); *cf. United States v. Sebetich*, 776 F.2d 412, 428 (3d Cir. 1985) ("[E]vidence of the statements [of the defendant's intent], which would have corroborated earlier evidence linking [the defendant] to the crime, should have been admitted.").  Various witnesses, including Lieutenant Thomas, Paolini, and

7

Zuck all provided testimony and evidence confirming Munsterman's snakes were in fact sold and shipped to Glades.[8]

Defendants' other arguments also miss the mark. There was no compound hearsay involved because the statement at issue was made by Munsterman to Lieutenant Thomas, which constitutes a single level of hearsay admissible under Rule 803(3). Defendants' claim that the statement lacked sufficient indicia of reliability is irrelevant because the Confrontation Clause does not apply and the statement was not admitted under the residual hearsay exception. *See* Fed. R. Evid. 807(a)(1) (permitting admission of hearsay statements not covered by an exception if "the statement has equivalent circumstantial guarantees of trustworthiness").[9] Even if the Court were required to independently examine the statement's reliability, the requisite reliability

---

[8] The Court also finds the Government never argued the statement for its truth during closing. Rather the prosecutor only repeated Munsterman's statement of his intent, and did not argue that the statement itself proved the snakes were shipped to Glades. Later in closing, the Government discussed the evidence showing that the snakes were sent to Glades in Florida. This approach was permissible under Rule 803(3). That there existed independent evidence of Glades's receipt of the illegally obtained snakes also makes the admission of Munsterman's statement, if in error, harmless.

[9] During trial, Defendants orally supplemented their objection to the introduction of Munsterman's statement as violating the Confrontation Clause. In their post-trial motions, Defendants did not expand on this aspect of their objection or make any arguments related to it. The Government also did not address the Confrontation Clause issue in its response. For the purposes of deciding Defendants' motions, because the issue has not been fairly presented to the Court for analysis and resolution, it must be considered waived. Nevertheless, the Court finds the Confrontation Clause does not apply to bar admission because Munsterman's statement was non-testimonial. *See United States v. Berrios*, 676 F.3d 118, 126 (3d Cir. 2012) (holding if a statement is non-testimonial the Confrontation Clause "has no role to play in determining the admissibility of a declarant's statement" and "the 'indicia of reliability' test of *Roberts* is no longer an appropriate vehicle for challenging admission of nontestimonial hearsay"), *cert. denied*, 133 S. Ct. 982 (2013). Among other reasons, Munsterman's statement cannot be considered testimonial because, as far as Munsterman knew, his statement was nothing more than a "casual remark to an acquaintance." *Id.* at 127; *see also Brown v. Epps*, 686 F.3d 281, 287 (5th Cir. 2012) (finding statements unknowingly made to an undercover officer are not testimonial in nature and observing "[m]any other Circuits have come to the same conclusion, and none disagree") (citations omitted).

can be inferred because the statement was admissible under Rule 803(3)—a firmly rooted hearsay exception.  *See Idaho v. Wright*, 497 U.S. 805, 815 (1990) ("Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception."); *Collins v. Diguglielmo*, No. 10-851, 2013 WL 3305233, at *28 (E.D. Pa. July 1, 2013) (finding the state-of-mind hearsay exception firmly rooted because it has been recognized by the Supreme Court for over a century and it exists in every jurisdiction in the country (citing *Horton v. Allen,* 370 F.3d 75, 85 (1st Cir. 2004)).

### 2. Germany Shipment

Next, Defendants argue the Court erroneously admitted evidence of Keszey's October 2008 shipment of timber rattlesnakes to Germany under Rule 404(b).[10]  Contrary to Defendants' arguments, the Court did not admit this evidence under Rule 404(b); rather, it relied on the "intrinsic evidence" exception to Rule 404(b).  *See* Order, Nov. 5, 2013, ECF No. 87.  Proffered evidence is intrinsic and not subject to Rule 404(b) if the misconduct either "directly proves the charged offense" or is "performed contemporaneously with the charged crime" and "facilitate[s] the commission of the charged crime."  *United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010) (citations omitted).  Because Defendants have offered no reasons why it was error for this Court to admit evidence of the Germany shipment under the intrinsic evidence exception, they have provided no grounds to conclude a new trial is warranted.[11]

---

[10] Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).

[11] In its motion in limine on this issue, the Government represented that it was seeking to "introduce evidence showing that the defendants shipped the animals involved in this matter to Europe. . . .  This evidence corroborates that the defendants did, in fact, receive the timber

The Court questioned Defendants on this issue during post-trial oral argument to determine whether they conceded that the shipment was intrinsic to the crimes charged. Defendants refused to concede as much, but when asked why the evidence was not intrinsic, they

---

rattlesnakes as alleged in the indictment and is directly relevant to the defendants' guilt." Mot. to Admit Evid. Pursuant to Rule 404(b) at 7.  In ruling on the admissibility of the Germany shipment prior to trial, the Court found because the Lacey Act requires the Government to prove, among other things, the knowing transportation of illegally obtained animals in interstate commerce, evidence that the snakes at issue in this case were shipped to Germany—which provides proof of that element—is intrinsic to the crime charged.  To clarify the record on this point, the Court acknowledges that the indictment does not specifically charge Defendants with the shipment of timbers to Germany.  The conspiracy charge and the charge alleging a substantive Lacey Act violation both point instead to the shipment of the timbers from Pennsylvania to Florida, which the Government contends were later shipped to Germany. During oral argument, the Government conceded the Germany shipment was likely not intrinsic as to Count Two, because it does not directly prove an element of the substantive Lacey Act violation charged in the indictment. *See* Hr'g Tr. 41-42, March 14, 2014.  Nevertheless, to the extent the Court erred in admitting the evidence on this basis prior to trial, the error is harmless for three reasons.

First, even if not intrinsic to Count Two, the shipment to Germany was admissible as intrinsic to the conspiracy charge because it directly proves a conspiracy to traffic in illegal animals, and in proving a conspiracy, "[t]here is general agreement that the Government is not limited in its proof at trial to those overt acts alleged in the indictment." *United States v. Adamo*, 534 F.2d 31, 38-39 (3d Cir. 1976); *see also United States v. Gibbs*, 190 F.3d 188, 218 (3d Cir. 1999) (holding evidence of uncharged overt acts is intrinsic and not subject to Rule 404(b) if it directly proves the charged conspiracy); *Green*, 617 F.3d at 249 ("If uncharged misconduct directly proves the charged offense, it is not evidence of some 'other' crime." (citing *Gibbs*, 190 F.3d at 218)).  Second, even if it was error to admit the Germany shipment as intrinsic to Count Two, MacInnes was not harmed by the admission because the substantive Lacey Act violation required only proof that the snakes were shipped from Pennsylvania to Glades in Florida.  The Government provided independent proof of the shipment from Pennsylvania to Florida, unrelated to any later shipment to Germany.  During trial, Defendants argued the snakes shipped to Germany were not the same snakes shipped to Florida, and the jury was never required to infer the snakes were the same.  Third, evidence of the shipment to Germany would have been admissible under Rule 404(b) as to both counts in the indictment because it provided relevant evidence of motive—Zuck testified Defendants told him they wanted to sell the snakes at an upcoming show in Europe because timber rattlesnakes are more valuable in Europe. *See* Trial Tr. 151-52, Nov. 8, 2013; Trial Tr. 181, Nov. 12, 2013.  Evidence of the shipment would have also satisfied Rule 403 balancing requirement.  Where otherwise admissible Rule 404(b) evidence is at issue, the Government is required to provide pretrial notice of its intent to introduce such evidence (which it did), and the Court must give a limiting instruction if asked (which it was not, even though Defendants appear to have believed the evidence was admitted under Rule 404(b)). *See Green*, 617 F.3d at 249.

argued that there was insufficient proof linking the snakes collected in New York to the snakes that were shipped to Germany.  Defendants were free to make that argument during trial, and they did.  Issues of proof aside, pressing a sufficiency of the evidence argument does not suggest to this Court that the shipment to Germany was in any way extrinsic to the crimes charged.  If the snakes at issue in this case were later shipped to Germany, the shipment represents an act in furtherance of the conspiracy to traffic in illegal animals.  It was for the jury (not the Court under Rule 404) to decide whether the Government provided sufficient proof that the snakes shipped to Germany were the same snakes shipped from Pennsylvania to Florida.[12]

## B.  Excluded Evidence

### 1.  Limitations on the Testimony Admitted

Defendants claim that their theory of the defense was improperly limited because the Court prevented them from eliciting testimony both on cross-examination and from their proffered expert, Terry Wilkins, to establish the following facts: (1) timber rattlesnakes are legal and unprotected in several states close to Florida, including Georgia, South Carolina, and Virginia; (2) they are found in approximately thirty states, not just New York and Pennsylvania; and (3) the natural birth cycle of timber rattlesnakes is to give birth to their young in late summer/early fall, making the species plentiful throughout the fall, when agents noted an

---

[12] While Defendants take issue with Zuck's credibility, there can be no doubt that he provided evidence that the snakes shipped to Florida were those shipped to Germany.  In a pretrial motion, Defendants unsuccessfully sought to exclude evidence associated with a proffer session wherein Zuck described a phone call with Keszey that occurred on September 10, 2008.  According to Zuck, during that call Keszey specifically discussed the snakes illegally caught in New York and told him they wanted the timbers because they would command a high price at the upcoming Germany reptile show.  Zuck relayed the substance of this conversation during trial.  In their motion, Defendants described this evidence as providing "direct proof of the government's theory . . . that Glades wanted the timber rattlesnakes to take to the Germany show because the defendants believed that the snakes are more valuable in Europe than here in the United States." Def's' Joint Mot. to Exclude Evid. or, in the Alternative, to Postpone Trial 3.

increase in the inventory of timber rattlesnakes on Glades's website.

Upon consideration of Defendants' arguments and the testimony admitted at trial, the Court first finds it properly exercised its discretion to limit cross-examination on these issues. The Government did not question any witness on direct regarding the timber rattlesnake regulatory scheme of any state besides those involved in this case, New York and Pennsylvania, nor was any government witness questioned on the breeding cycle of timber rattlesnakes or the species' prevalence in other states. There was therefore no occasion on which it would have been proper to cross-examine government witnesses on those issues. *See* Fed. R. Evid. 611 ("Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility.").

To the extent Defendants take issue with this Court's November 13, 2013, Order denying their request to permit Terry Wilkins to testify as an expert on these subjects during trial, the Court need not elaborate on the reasons why Wilkins did not qualify as an expert. *See* Order, Nov. 13, 2013, ECF No. 96 (precluding Wilkins's testimony under Rule 702). Regarding Defendants' arguments that Wilkins should have been allowed to testify as a lay witness, the testimony Defendants sought to elicit from Wilkins, including the differences between wild-caught and captive-bred snakes and the breeding cycles, habitat, commonality, and market value of timber rattlesnakes, would have required expert testimony. *See e.g.*, Trial Tr. 185-86, Nov. 8, 2013 (sustaining Defendants' objection that testimony from government lay witness on how indigo snakes were bred was expert testimony); Trial Tr. 216-18, Nov. 12, 2013 (sustaining Defendants' objection that testimony on habits of captive versus wild snakes was expert testimony).[13] Even if Wilkins's testimony did not require expertise, many of the intended topics

---

[13] Defendants argue in particular that Wilkins's testimony was necessary "to refute the

concerned irrelevant issues, *see* Rule 401, carried significant potential for jury nullification (as

discussed below), *see* Rule 403, were not rationally based on Wilkins's perception or helpful to

determine a fact in issue, *see* Rule 701, and concerned topics on which his personal knowledge

was limited, *see* Rule 602.[14]

Moreover, the information Defendants tried to elicit on breeding cycles and other state

regulatory schemes was only marginally relevant, if at all,[15] and would have wasted time and

confused the jury.  Permitting such testimony could have also raised issues regarding jury

---

government's claim that the Indigo snakes in the possession of Zuck were not captive bred."
Def. MacInnes's Mot. for a New Trial Pursuant to Fed. R. of Crim. P. 33, at 6.  As noted above,
this Court sustained Defendants' objection that any testimony regarding whether an indigo snake
was captive-bred or wild-caught would require an expert.  As such, Wilkins could have only
testified as to this matter if he qualified as an expert, which the Court ruled he did not.  Even if
Wilkins could have testified on this subject as a lay witness, the issue is ultimately irrelevant.
Eastern Indigo Snakes are a federally protected species under the Endangered Species Act;
therefore, movement of *any* Eastern Indigo Snakes across state lines was unlawful without a
permit.  Agent Cottrell testified that Defendants had no such permit.  Trial Tr. 212, Nov. 12,
2013.  The Lacey Act does not differentiate between unlawful trafficking in captive-bred wildlife
or wild-caught wildlife.   If the wildlife in question was in some manner unlawful, then
transportation of that wildlife is a violation of the Lacey Act.  *See United States v. Delaney*, 795
F. Supp. 2d 125, 127-28 (D. Mass. 2011).

[14] For instance, Defendants attempted to have Wilkins testify regarding the regulatory schemes
governing timber rattlesnakes in states other than the ones at issue in this case.  Not only was
testimony regarding other states' regulatory schemes irrelevant, when asked, Wilkins could not
correctly identify the regulatory scheme governing timber rattlesnakes in Pennsylvania during
the time period relevant to the indictment in this case.  His inability to do so casted significant
doubt on his ability to testify accurately to other states' regulatory schemes.

[15] Though Defendants claimed to have other legal sources for timber rattlesnakes, there was no
testimony or other evidence that Glades obtained timber rattlesnakes in the fall of 2008 from a
state other than New York and from a source other than Munsterman and Paolini.  In the absence
of any such evidence, the regulatory scheme governing timber rattlesnakes in other states and
timbers' prevalence in those states were irrelevant to any fact of consequence in determining the
action.  Whether it is legal to collect timber rattlesnakes without a permit in a particular state
only matters if there was some basis to suggest Glades did in fact obtain timber rattlesnakes from
that state during the relevant time period set forth in the indictment.  *See* Fed. R. Evid. 401
(stating that evidence is relevant if it "has any tendency to make a fact more or less probable than
it would be without the evidence; and the fact is of consequence in determining the action").

nullification that the Court had to contend with throughout the trial, i.e., the suggestion there was no environmental harm in this case because timbers are plentiful in the United States and were not harmed by Defendants.  *See, e.g.*, Gov't's Mot. In Limine to Preclude Further Argument and Evidence that Would Invite Jury Nullification, ECF No. 89; Trial Tr. 17-19, Nov. 12, 2013 (Wilkins discussing his intent to testify regarding "rattlesnake roundups" occurring in Texas and Georgia where people would kill timber rattlesnakes, "chopping their heads off while they're still wiggling and squirming in front of the crowd"); *id.* at 21 (Wilkins stating "[t]here are areas of Pennsylvania where I could go out and see probably at least 20, 30 timbers a day.").  These lines of questioning were therefore properly limited under Rule 611, Rule 401, and the Rule 403 balancing test.[16]

### 2. Recorded Exchange Between Zuck and Agent Sullivan

During trial, this Court ruled that a recording of an exchange between Zuck and another NY DEC investigator, Agent Sullivan, in which Sullivan explained to Zuck some of the legal issues he faced,[17] was inadmissible.  *See* Trial Tr. 65, Nov. 12, 2013.  Defendants first argue the

---

[16] Even if the Court erred in restricting certain lines of questioning, the error was harmless because Defendants were permitted to elicit sufficient testimony on these topics to make closing arguments based on their theory of the case.  For instance, Defendants cross-examined Lieutenant Thomas, Darren Paolini, and Kristen Wiley on the prevalence of timber rattlesnakes in other states and the laws regulating the collection of timbers.  *See e.g.*, Trial Tr. 54, Nov. 6, 2013 (asking Thomas whether timbers come from other states); Trial Tr. 78, Nov. 8, 2013 (asking Paolini whether timber rattlesnakes can be found in thirty-one states and whether some of those states allow lawful collection of timbers); Trial Tr. 205, Nov. 12, 2013 (asking Wiley whether it was lawful to collect and sell timber rattlesnakes in other states).  This Court also expressly permitted Defendants to ask questions regarding the birthing cycles of timber rattlesnakes, over the Government's objection.  *See* Trial Tr. 201, Nov. 12, 2013.  In addition, as a part of their affirmative case, Defendants called Eric Timaeus, who testified that he and MacInnes had collected rattlesnakes in the Georgia wilderness over the years, including during the spring of 2008.  *See* Trial Tr. 65-68, Nov. 13, 2013.  Counsel for Defendants then argued based on these lines of questioning during closing.

[17] The at issue exchange occurred when Agent Sullivan stated "maybe you shouldn't be the

recording was admissible under Rule 803(3) because it provided evidence of Zuck's state of mind. Zuck made two substantive statements in the recording: (1) he understood what Agent Sullivan was saying (which is irrelevant for the purposes of the Rule 803(3) inquiry), and (2) he wanted to speak to a lawyer (which is irrelevant to any inquiry). Zuck's statement that he understood what Agent Sullivan was saying is not a statement of intent or plan, nor does it otherwise illuminate Zuck's state of mind. Defendants sought to have the recording admitted to establish their theory that Sullivan pressured Zuck into fabricating a story against Defendants; they wanted the jury to hear Agent Sullivan's statements, not Zuck's. Statements under Rule 803(3) are only admissible, however, to show the *declarant's* state of mind. Sullivan's statements, which were hearsay,[18] would therefore not be admissible under Rule 803(3) to show Zuck's state of mind.

Defendants also maintain the recording was important impeachment evidence going to Zuck's credibility and his motive to lie. The Court ruled, however, that the recording was inadmissible under Rule 608(b) because it constituted an attack on Zuck's character for truthfulness, and "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). A trial court may, however, allow specific instances of conduct to be inquired into on

---

center focus here . . . with legal problems involving Glades." Zuck responded that he did not know what Agent Sullivan meant by that, and Sullivan expanded on the point, suggesting that if Zuck had anything on Glades or the Defendants, he should cooperate. Zuck then stated: "I know what you're saying, now—you made it clear. I understand what you're saying."

[18] The Court notes that by arguing the statement was admissible under a hearsay exception (Rule 803(3)), the defense appears to have conceded that the statements in the recording were in fact hearsay. While Defendants' position is not entirely clear, if Defendants maintain that the statements were not hearsay because they were not being offered for the truth, but rather for the effect on the listener, the statements nonetheless have little probative value, and as explained below, were excludable under Rule 403 and Rule 608(b).

cross-examination if they are probative of the witness's character for truthfulness or untruthfulness, and the Court therefore permitted Defendants to cross-examine Zuck on his interaction with Sullivan. The Court only refused to admit the actual recording into evidence, consistent with Rule 608(b). *See* Trial Tr. 66, Nov. 12, 2013 ("You could cross-examine him on statements that he made to any police officer and attack him, but you're not going to get Sullivan's statements into the record in this case. I don't think that's proper.").[19]

The Court recognizes that if the recording also went to Zuck's bias it could be admissible notwithstanding Rule 608(b). *See United States v. Abel,* 469 U.S. 45, 56 (1984) (declining to address the admissibility of evidence under Rule 608(b) because "[i]t was enough that such evidence could properly be found admissible to show bias"). As noted above, however, Zuck made no statement on the recording that would be relevant to bias. It is speculative at best to suggest Sullivan's statements alone would establish Zuck's bias, and admitting the recording into evidence would have wasted time, delayed the trial, and confused the issues. Had the Court not excluded the recording as hearsay and impermissible character evidence, it would have excluded it under Rule 403 because the minimal probative value of the evidence would have been substantially outweighed by the prejudicial effect.

Finally, Defendants were not harmed by the decision to exclude the evidence, because defense counsel was permitted to, and in fact did, cross-examine Zuck extensively on his interaction with Sullivan and the plea deal he received in exchange for his cooperation.

---

[19] At the time the Court ruled on this issue, it also provided Defendants the opportunity to point to some rule of evidence or case law supporting their position, but Defendants did not avail themselves of this opportunity. In fact, in both their original motions filed on November 29, 2013, and in their supplemental memorandum filed on February 14, 2014, Defendants cited to only one case (the same case upon which they relied orally during trial to support their theory of the defense instruction, addressed below). For every other argument and claim of error Defendants asserted in their motions for a new trial, they cited no legal precedent, despite the

Defendants' theory, that Zuck was pressured into fabricating a story implicating them, was thoroughly developed at trial and argued during closing.

### 3. Evidence of Keszey's Good Character

Defendants contend that this Court prohibited them from introducing evidence of Keszey's good character by stating if such evidence were offered, it would permit cross-examination on a settlement entered into by Glades (and signed by Keszey) that, prior to trial, the Court found inadmissible under Rule 404(b). Keszey's contention in this regard is unsupported by the record. During a sidebar called to address another evidentiary issue (uncontested in the instant motions), counsel for the Government stated that if Defendants elicited testimony regarding Keszey's reputation for law abiding conduct, then the Government should be permitted to rebut with specific instances of conduct. After this discussion between counsel, the Court simply noted that under the applicable Rule of Evidence, character traits elicited by the defense could be attacked on cross-examination. *See* Trial Tr. at 94, Nov. 13, 2013; *see also* Fed. R. Evid. 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.").

While Defendants now claim the Rule 404(b) evidence at issue would not have been appropriate rebuttal material, it was Defendants' decision not to introduce character testimony. This Court never had the opportunity to consider whether the Rule 404(b) evidence was appropriate for rebuttal, nor did it ever rule that such evidence would be admitted if Defendants elicited testimony regarding Keszey's good character. Defendants cannot now claim their tactical decision not to pursue a particular line of questioning provides grounds for a new trial simply because they feared at the time the Court may have issued an adverse ruling it did not.

---

fact that it is their burden to prove this Court committed legal error.

**C. Jury Instructions**

**1. Defendants' Proposed Theory of the Case Instruction**

On the last day of trial, the defense requested that the Court instruct the jury as follows:

> It is the theory of the defense in this case that Loren Zuck never shipped timber rattlesnakes to Glades Herp and that the September 21, 2008 shipment contained other venomous reptiles. There were multiple legal sources for the timber rattlesnakes that were offered for sale by Glades during the relevant time frame, both domestically and in Germany.

Defendants argued during trial that this instruction was appropriate under *United States v. Sussman*, 709 F.3d 155, 178 (3d Cir. 2013). Under *Sussman*, a defendant is entitled to a theory of defense instruction where "(1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include the instruction of the defendant's theory would deny him a fair trial." *Id.*

The Court found the instruction was not warranted under the authority of *United States v. Hoffecker*, in which the Third Circuit observed that a defendant is not "entitled to a judicial narrative of his version of the facts." 530 F.3d 137, 176 (3d Cir. 2008). Where the proposed instruction is in effect argument, or is "essentially a recounting of the facts as seen through the rose-colored glasses of the defense—glasses that [the defendant] hoped the jurors would wear when they retired to the jury room," then the instruction is not appropriate. *Id.* These considerations were the guiding force prompting this Court to deny the instruction, and the Court finds no reason to depart from its prior ruling.[20]

---

[20] Defendants also did not obtain sufficient evidentiary support for their proposed theory. Zuck testified that the September 21, 2008, shipment contained timber rattlesnakes, which Paolini corroborated, and Zuck also testified that the Defendants discussed the snakes at issue with him after receiving them. There was also no testimony or other evidence that Glades obtained timber rattlesnakes in the fall of 2008 from another source. In these circumstances, even if the proposed instruction was not properly rejected under the considerations set forth in *Hoffecker*, it could not satisfy the second prong in *Sussman*. In any event, assuming it was error to refuse this proposed

**2. False Exculpatory Statements Instruction**

Over Keszey's objection, the Court gave a jury instruction based on the Third Circuit

model regarding false exculpatory statements:

> Members of the jury, you also heard testimony that Defendant Keszey made
> certain statements outside the courtroom in which Defendant Keszey claimed that
> his conduct was consistent with innocence and not with guilt. If you find a
> Defendant made a false statement in order to direct attention away from himself,
> you may but are not required to conclude that the Defendant believed that he was
> guilty. It is reasonable to infer an innocent person does not usually find it
> necessary to invent or fabricate an explanation or statement tending to establish
> his innocence. You may not, however, conclude, on the basis of this alone, that a
> Defendant is, in fact, guilty of the crime for which he is charged. You must decide
> whether or not the evidence as to Defendant Keszey shows that he believed he
> was guilty and the significance, if any, to be attached to this evidence. In your
> evaluation, you may consider that there may be reasons, fully consistent with
> innocence, that could cause a person to give a false statement that he did not
> commit a crime. Fear of law enforcement, reluctance to become involved or
> simply a mistake may cause an innocent person to give such a statement or
> explanation.

Trial Tr. 41-42, Nov. 15, 2013.

The statements prompting the instruction were made during a recorded phone

conversation between Keszey and Zuck.   When Zuck asked Keszey what to do when the

authorities asked him about illegal timber rattlesnakes, the conversation proceeded as follows:

> LOREN ZUCK: You don't have any of them down there anymore? You got rid of
> them all?
> ROBERT KESZEY: I didn't get any from there. I only get—the only place I get
> timbers from is um, what's his name in Kentucky. Jim Harrison.
> LOREN ZUCK: That doesn't help me out.
> ROBERT KESZEY: Yeah, but that shows that we don't get any from you.
> LOREN ZUCK: Yeah, what am I supposed to say I did with ones I got?
> ROBERT KESZEY: You didn't get—you let them go, you didn't get any.
> LOREN ZUCK: I got two people testifying that says I did. That doesn't work, I
> can't go before a judge and say, "Oh, Darren and Justin are corroborating and
> lying and I didn't get 'em." That just freakin' leaves me up hanging to dry.

---

jury instruction, there is no harm if Defendants are allowed to argue the theory during closing,

*See* Gov't's Mem. of Law in Supp. Of its Mot. to Admit Recordings Ex. 3, at 3-4.  Keszey objected to the instruction and argues that since it could have been true that his only source of timbers was Jim Harrison, the Court's instruction regarding false exculpatory statements was in error.  The Court decided the instruction was appropriate because there was evidentiary support for it, and therefore overruled the objection.  *See United States v. Battles*, 514 F. App'x 242, 247 (3d Cir. 2013) (finding no error in giving false exculpatory statement instruction when there was sufficient evidentiary support for the instruction).

As an initial matter, the Government points out (correctly) that Defendants' own theory of the case makes Keszey's statement false, since Defendants argued that they had multiple legal sources of timber rattlesnakes.  Moreover, Kristen Wiley, who runs the Kentucky Reptile Zoo with Harrison, testified they only sent timbers to Glades once, in January 2008, and those snakes could not have been the same snakes that were shipped to Glades in September 2008.  In addition to Wiley's testimony suggesting that Glades must have had an additional source of timber rattlesnakes (even if the source was someone other than Munsterman and Paolini), Zuck and Paolini testified that they had sent timber rattlesnakes to Keszey.  Even assuming Keszey's statement that Harrison was his only source of timbers was backed by any evidence supporting its truth, the instruction left for the jury to determine whether the statement was true or false.

The defense also asserts the false exculpatory statement instruction was erroneous because Defendants obtained after-discovered evidence that Kristen Wiley perjured herself.  Defense counsel asked on cross-examination if Wiley had ever attended a reptile show in San Antonio, Texas, in 2013.  She responded that she never had attended a San Antonio reptile swap meet and did not attend the one "last spring in San Antonio."  *See* Trial Tr. 201-202, Nov. 12,

which they were.  *See United States v. Sylvester*, 365 F. App'x 379, 382-83 (3d Cir. 2010).

2013.  Defendants now maintain they have proof Wiley did attend a reptile show in San Antonio.

They have submitted to the Court a "Purchaser's Venomous Waiver," which purportedly shows

she was at an event called the "Texas Reptile Expo" held in a town called Live Oak, Texas

(twenty miles outside of San Antonio), in the fall (September 8, 2013), not the spring.  This

evidence does not provide proof of perjury, and, even if it did marginally affect her credibility,

Wiley's testimony did not bear on Keszey's theory that Jim Harrison had been doing business

with Keszey for years—and was his exclusive source of timber rattlesnakes.[21]

### 3. Clarifying Instruction Regarding Overt Acts

During trial, Defendants sought a clarifying instruction explaining to the jury that it could

only convict on the conspiracy count if it unanimously agreed that Keszey conspired with others

to ship the snakes to Glades in 2008.  According to Keszey, the only overt act that the jury was

permitted to consider for the purposes of the conspiracy count was the shipment of timber

rattlesnakes by Zuck from Pennsylvania to Florida.[22]  At trial, Zuck testified that certain events

---

[21] Defendants also contend this "newly discovered evidence" independently warrants a new trial.
Five requirements must be met before a court may grant a new trial on the basis of newly
discovered evidence: (1) "the evidence must be in fact newly discovered, i.e. discovered since
trial"; (2) "facts must be alleged from which the court may infer diligence on the part of the
movant"; (3) "the evidence relied on must not be merely cumulative or impeaching"; (4) "it must
be material to the issues involved"; and (5) "it must be such, and of such nature, as that, on a new
trial, the newly discovered evidence would probably produce an acquittal." *United States v.
Quiles*, 618 F.3d 383, 388-89 (3d Cir. 2010) (quoting *United States v. Saada*, 212 F. 3d 210, 216
(3d Cir. 2000)).  Even if the "Purchaser's Venomous Waiver" qualified as newly discovered
evidence, it is insufficient to warrant granting a new trial for three reasons: (1) it is mere
impeachment evidence; (2) it is immaterial to the issues involved; and (3) it would not probably
produce an acquittal.

[22] Keszey's entire argument on this point is ultimately irrelevant because the jury convicted
Defendant MacInnes of the offense in Count Two, which charged MacInnes with trafficking in
illegal timber rattlesnakes when he caused Zuck to ship the snakes to Glades on September 21,
2008.  Because the jury found MacInnes and Zuck did in fact engage in the very act that would
sustain Keszey's conspiracy charge, instructing the jury that it could have only considered that
single act would have made no difference and would still have resulted in Keszey's conviction.

alleged in the indictment actually occurred a year earlier than he had recalled when first speaking to Government agents. *See* Trial Tr. 144-46, Nov. 8, 2013. As a result, several of the overt acts alleged in the indictment, *see* ¶¶ 14-18, took place prior to November 13, 2007, which was the statute-of-limitations cut-off for events occurring prior to the filing of the indictment. The Court did instruct the jury that the only overt acts it could consider were those occurring after November 13, 2007, but refused to deliver Defendants' proposed instruction.

Count One of the indictment alleged twelve overt acts occurring from 2007 through December 2008, and the evidence showed at least six of the overt acts set forth in the indictment occurred after November 13, 2007. *See id.* ¶¶ 19-25. Any one of these overt acts could have been properly considered by the jury as a basis to sustain the conspiracy charge. *See United States v. Somers,* 496 F.2d 723, 744–45 (3d Cir. 1974) ("[P]roof of the acts charged on any date within the statute of limitations and before the return date of the indictment is sufficient to support a conviction."). Moreover, though some of the overt acts listed in the indictment did occur prior to November 13, 2007, a conspiracy "is a continuing offense and a jury may consider each and all of a defendant's actions in furtherance of the conspiracy so long as the indictment is brought within five years of the last overt act." *United States v. Amirnazmi*, 645 F.3d 564, 592 (3rd Cir. 2011).[23] Given these considerations, the Court denied the proposed instruction.

### D. Commentary on Defendant MacInnes's Fifth Amendment Right

MacInnes contends that during closing, the prosecutor highlighted MacInnes's silence during a recorded telephone conversation with Zuck as constituting evidence of MacInnes's guilt, and thereby violated his right to remain silent under the Constitution. MacInnes provided no factual (or legal) citation in support of this claim, but the relevant passage appears to be the

---

[23] In addition, as noted above, there is "general agreement that the government is not limited in

prosecutor's statement that during the recorded call with Zuck, "at no point did Defendant MacInnes deny anything.  He just said don't talk to the authorities, don't talk to the authorities, don't talk to the authorities."  Trial Tr. 23, Nov. 14, 2013.  The prosecutor's comments violated no constitutional right, however, because during the recorded exchange, MacInnes had not been arrested; he was not in police custody; and the circumstances surrounding the conversation did not implicate MacInnes's Miranda or Fifth Amendment rights.  *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust."); *Salinas v. Texas*, 133 S. Ct. 2174, 2180 (2013) (holding "the prosecution's use of [the defendant's] noncustodial silence did not violate the Fifth Amendment"); *cf. Jenkins v. Anderson*, 447 U.S. 231, 243 (1980) ("The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police.") (Stevens, J., concurring).

While the Court analyzed each of the foregoing purported errors individually, it has also considered them together to determine whether they had a substantial influence on the outcome of the trial.  The Court concludes that despite Defendants' protestations to the contrary, they received a fair trial, and have provided no grounds, individually or in the aggregate, for another. Accordingly, their motions for a new trial will be denied.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.

---

its proof at trial to those overt acts alleged in the indictment." *Adamo*, 534 F.2d at 38.